**MARC P. BERGER**
**REGIONAL DIRECTOR**
Lara S. Mehraban
Preethi Krishnamurthy
Sheldon L. Pollock
Todd Brody
Bennett Ellenbogen
Lindsay S. Moilanen
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0080 (Brody)**
BrodyT@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                        **Plaintiff,**<br><br>                  -against-<br><br>**JACK BREWER,**<br><br>                                        **Defendant.** | **COMPLAINT**<br><br>**20 Civ. 6175 (    )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Jack Brewer ("Brewer"), alleges as follows:

**SUMMARY**

1.      In January 2017, Jack Brewer—the owner and principal of both a Commission-

registered investment adviser and a consulting firm, each bearing his last name—engaged in

unlawful insider trading in the stock of COPsync, Inc. ("COPsync"), among other securities law

violations.

2.    Brewer provided consulting and endorsement services to COPsync, a microcap company that operated a communication network for law enforcement officers. Brewer did so pursuant to at least two agreements he signed, which prohibited him from using or disclosing confidential information he learned from the company. In return, Brewer and his companies received payment in cash and shares of COPsync's stock.

3.    In approximately December 2016, Brewer, through this consulting and endorsement relationship, learned that COPsync was engaged in efforts to sell two million shares of its freely-trading stock in a private stock offering, likely at a significant discount to the market price. Brewer knew that there would likely be a negative impact on COPsync's stock price once the market learned of the private offering.

4.    In late December 2016, Brewer entered into a stock purchase agreement with COPsync to buy shares in the offering. Under the agreement's terms, Brewer agreed that he would not buy or sell any shares of the company's stock before the company issued a press release announcing the offering to the public.

5.    On January 4 and 5, 2017, before COPsync issued any such press release, Brewer sold 100,000 shares of his pre-existing stock in the company at prices ranging from $1.01 to $1.16 per share, for proceeds of approximately $104,000.

6.    On the morning of January 6, 2017, the company issued a press release announcing that it had issued over 1.77 million shares of stock (including warrants to purchase additional shares) in a private offering at an average price of $0.65 per share. At the end of that trading day, the market price of the stock closed at $0.69 per share, a 30% decrease from the prior day's closing price.

7.    By unlawfully selling his shares on January 4 and 5 based on the material, non-public information he had obtained, Brewer profited by approximately $35,000 more than he would have had he sold his shares shortly after COPsync issued its press release.

8.      In addition, from at least 2015 until November 2017, Brewer aided and abetted his investment advisory firm's failure to design and enforce its written policies and procedures to prevent the misuse of non-public information. For example, despite the firm's written policies requiring that the firm maintain a list of restricted stocks about which firm personnel had material, non-public information and in which they would therefore not be permitted to trade, Brewer failed to ensure that his firm maintained such a list.

9.      From at least April 2015 through July 2017, Brewer also unlawfully acted as a securities broker—including by working with microcap companies to provide advice on raising capital, introducing the companies to sources of capital, identifying potential investors, and soliciting investors for the companies—without being associated with a broker-dealer or being registered as a broker with the Commission.

## VIOLATIONS

10.      By engaging in the conduct set forth in this Complaint, Brewer violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)], and aided and abetted violations of Section 204A of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-4a] and Rule 204A-1 thereunder [17 C.F.R. § 275.204A-1].

11.      Unless Brewer is permanently restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

12.      The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A(a) [15 U.S.C. §§ 78u(d) and 78u-1(a)] and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)].

13.     The Commission seeks a final judgment (a) permanently enjoining Brewer from violating the federal securities laws and rules this Complaint alleges he violated; (b) ordering Brewer to disgorge the ill-gotten gains he received with prejudgment interest thereon; (c) ordering Brewer to pay civil money penalties pursuant to Exchange Act Sections 21A and 21(d)(3) [15 U.S.C. §§ 78u-1 and 78u(d)(3)] and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (d) prohibiting Brewer from participating in any offering of a penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa] and Advisers Act Section 214 [15 U.S.C. § 80b-14].

15.     Brewer, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa] and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Brewer transacted business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, Brewer attended COPsync's Board of Directors meeting in Manhattan on December 9, 2016; Brewer's Manhattan-based broker placed Brewer's relevant trades in COPsync's stock; and Brewer's investment advisory firm had its principal place of business in New York City.

## THE DEFENDANT

17.     **Brewer**, age 41, resides in Minnesota and Florida. From at least 2011, Brewer was the president, chief executive officer, and portfolio manager of the Brewer Group Inc. ("Brewer Group"), a consulting firm. From at least 2010 until November 2017, Brewer was also the principal,

CEO, and portfolio manager of BSI Wealth Management LLC d/b/a Brewer Capital Management ("Brewer Capital"), a Commission-registered investment adviser. Brewer is, or until recently has been, the co-host of the digital podcast "Level Headed." In addition, Brewer has been a regular contributor to media networks, programs, and publications, including Yahoo Finance, CNBC, Fox Business, CNN, and the American City Business Journals.

## OTHER RELEVANT ENTITIES

18.     **Brewer Group** is a Minnesota corporation and consulting firm with a portfolio covering financial services, healthcare, agriculture, sports, media and entertainment. At all relevant times, Brewer was the Brewer Group's president, chief executive officer, and portfolio manager. Brewer owns 100% of the Brewer Group.

19.     **Brewer & Associates Consulting LLC ("Brewer Consulting")** was at all relevant times a wholly-owned subsidiary of the Brewer Group and has described itself as an "advisory firm focused on providing tailored business development, marketing and event management services and support for small-cap and middle market companies." At all relevant times, Brewer was Brewer Consulting's CEO.

20.     **Brewer Capital** was at all relevant times a Delaware limited liability company with its principal place of business in New York, New York. Brewer Capital was founded in 2009. From 2010 through November 2017, Brewer Capital was registered with the Commission as an investment adviser. According to its Form ADV dated October 30, 2017, filed with the Commission, Brewer Capital's managing member was Brewer Sports International, LLC, which Brewer managed and 80% of which the Brewer Group owned. At all relevant times, Brewer was Brewer Capital's CEO and portfolio manager.

21.     **COPsync** was a Delaware corporation with its principal place of business in New Orleans, Louisiana for portions of the relevant period. At all relevant times, COPsync purported to

5

operate the COPsync Network, a communication network for law enforcement officers. From at least December 31, 2008 until July 23, 2018, COPsync's common stock was registered under Exchange Action Section 12(g). From July 1, 2008 to November 2015, COPsync's common stock was quoted on the OTCQB, an interdealer quotation service. From November 2015 through at least January 2017, COPsync's shares were listed on the NASDAQ Capital Market under the ticker symbol "COYN." On September 29, 2017, COPsync filed a Chapter 11 petition in the U.S. Bankruptcy Court for the Eastern District of Louisiana. On July 23, 2018, the Commission revoked the registration of COPsync's common stock pursuant to Exchange Act Section 12(j). At all relevant times, COPsync's common stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a-51-1 thereunder [17 C.F.R. § 240.3a51-1], because the stock traded below five dollars per share and did not satisfy any of the exceptions to the definition of "penny stock" set forth in Rule 3a-51-1.

**FACTS**

**I.     BACKGROUND**

22.     From approximately 2002 to 2006, Brewer played football in the National Football League.

23.     Upon his retirement from professional football, Brewer transitioned his career to the financial services industry.

24.     In approximately 2006, Brewer founded the Brewer Group.

25.     In approximately 2007, Brewer became a registered representative of a large, Commission-registered broker-dealer firm in its Private Client Group.

26.     From approximately 2009 until 2011, Brewer served as a managing director of a Commission-registered, private, biotech-focused investment bank.

27. From approximately 2011 through 2015, Brewer worked as an associated person for at least three different firms in the financial services industry, other than his affiliated entities.

28. At various times from 2007 through 2016, Brewer held Series 7, Series 66, and Series 79 securities licenses, which permitted him to undertake certain securities-related activities.

29. In approximately 2009, Brewer founded Brewer Capital.

30. From approximately 2010 through November 2017, while registered with the Commission as an investment adviser, Brewer Capital provided investment advisory services to a handful of high net-worth individuals, primarily professional athletes and former professional athletes.

31. As of January 1, 2016, Brewer Capital had approximately $27 million in assets under management.

## II.   BREWER CAPITAL'S WRITTEN SUPERVISORY PROCEDURES DESCRIBED PROHIBITIONS ON INSIDER TRADING.

32. In both 2015 and 2016, Brewer Capital had written supervisory procedures.

33. Among other things, the written supervisory procedures for both years—which all Brewer Capital personnel were required to read, acknowledge in writing, and follow—stated:

> The legal prohibitions against 'insider trading' and [Brewer Capital]'s professional responsibility forbid the use or disclosure by all directors, officers and Access Persons of [Brewer Capital], for direct or indirect personal gain or profit of 'insider information' received in connection with the business of [Brewer Capital] or from any source. Moreover, the use of material, non-public information in securities transactions ('insider trading') or the communication of such inside information to others ('tipping') may violate federal and/or state securities laws. Such a violation of law could result in severe personal consequences to the individuals involved….

34. The written supervisory procedures for both years further stated:

> All persons associated with [Brewer Capital] are prohibited from engaging in any securities transaction for their own benefit or the benefit of others, while in possession of: (a) Material, non-public information concerning such securities which is known to the any

person by virtue of his or her position as an insider with respect to
the issuer of such securities….

35.     The same written supervisory procedures explained that "a person can be a
'temporary insider' if he or she enters into a special confidential relationship in the conduct of a
company's affairs and as a result is given access to information solely for the company's purposes"
and that "consultants" and "advisers" can be temporary insiders.

## III.     BREWER PROVIDED CONSULTING AND OTHER SERVICES TO COPSYNC.

36.     On approximately August 12, 2015, Brewer Consulting, the Brewer Group's wholly-
owned subsidiary, entered into a consulting agreement with COPsync, effective as of that date.

37.     Brewer signed the agreement on Brewer Consulting's behalf as its CEO.

38.     The agreement described COPsync as a "publically held company… (OTCQB:
COYN)."

39.     Under the agreement's terms, Brewer Consulting agreed to provide "global business
development and marketing" consulting services to COPsync at its request, including by
"participat[ing] in [COPsync] conference calls and meetings as requested."

40.     In exchange for its services, Brewer Consulting stood to receive $4,500 per month
from COPsync (to be accrued and payable only after COPsync's shares of common stock were
"uplist[ed]" on the NASDAQ exchange) plus one million shares of COPsync's common stock.

41.     The agreement lasted until the earlier of twelve months from the effective date or
the termination by either party with thirty days' written notice to the other party.

42.     The agreement contained a confidentiality provision that lasted for at least three
years:

> [Brewer Consulting] will maintain in confidence all proprietary, non-
> published information obtained by [Brewer Consulting] with respect
> to [COPsync] during the course of the performance of [Brewer
> Consulting]'s services hereunder, and [Brewer Consulting] shall not
> use any of the same for its own benefit or disclose any of the same to

> any third party, without [COPsync's] prior written consent, both
> during and within three (3) years after the term of this Agreement.
> For the purposes of this Agreement, "Confidential Information"
> means information about the Company's business activities that is
> proprietary and confidential, which shall include all business,
> financial, technical and other information of [COPsync]….

43.     On approximately December 1, 2015, Brewer Consulting and COPsync expanded

the consulting agreement by entering into an "Expansion Advisory Agreement," effective as of that

date.

44.     Brewer signed the expansion agreement on Brewer Consulting's behalf as its CEO.

45.     Under the agreement's terms, Brewer Consulting agreed to provide additional

services at COPsync's request, including "[a]ssisting in managing ongoing marketing efforts which

include working with [COPsync]'s investor relations strategic partners in an effort to increase market

awareness for [COPsync]'s publicly traded securities."

46.     In return, COPsync agreed to make monthly payments of $4,000 to Brewer

Consulting and to issue an additional 20,000 shares of COPsync's common stock directly to the

Brewer Group in two equal installments.

47.     The expansion agreement extended the original consulting agreement until the earlier

of twelve months from the expansion agreement's effective date—that is, November 30, 2016—or

termination in writing by either party.

48.     The expansion agreement ratified all other provisions in the original agreement,

including the three-year confidentiality provision.

49.     On approximately January 1, 2016, Brewer personally entered into an endorsement

agreement with COPsync, effective as of that date.

50.     Brewer signed the agreement on his own behalf, noting underneath his title of CEO

of the Brewer Group.

51.     The endorsement agreement provided that Brewer would "[e]ndorse and serve as a public figure for the Company" and would "work with [COPsync] to assist with enhancing [COPsync] brand recognition of the COPsync technology, services and product line"—including by "[a]ttend[ing] and participat[ing] in key, high-level [COPsync] meetings and calls upon occasion."

52.     In return, the endorsement agreement required COPsync to pay Brewer $1,500,000 either in four equal, quarterly installments or partly or wholly through certain "commission payments" Brewer stood to receive under the agreement.

53.     As further payment, the endorsement agreement required COPsync to issue 200,000 shares of COPsync's restricted common stock—in essence, stock that Brewer had to hold for a certain period of time before he could sell the stock into the public market, unlike freely-trading shares that could be sold upon receipt—to Brewer in two equal installments over six months.

54.     The endorsement agreement also contained a confidentiality clause that included the following terms:

> [Brewer] acknowledges and understands that in [his] capacity as [an e]ndorser, [he] will have access to [COPsync]'s and [COPsync]'s [*sic*] confidential and proprietary information (the 'Confidential Information'). [Brewer] agrees to hold in trust and confidence all Confidential Information disclosed to [him] and further agrees not to exploit or disclose the Confidential Information directly or indirectly for any purpose other than for [Brewer]'s work with [COPsync].

55.     The endorsement agreement had a term of 18 months from the effective date—that is, it lasted until June 30, 2017—absent an earlier written termination by either party in writing.

56.     COPsync issued the first 100,000 shares of its restricted stock to Brewer pursuant to the endorsement agreement on approximately February 12, 2016.

57.     Brewer exchanged these 100,000 restricted shares for freely-trading COPsync shares on approximately November 30, 2016.

## IV.    BREWER PARTICIPATED IN COPSYNC'S CONFIDENTIAL PLANS TO RAISE CAPITAL THROUGH A PRIVATE STOCK OFFERING.

58.    On July 1, 2016, COPsync filed a "shelf" registration statement with the Commission on Form S-3 in connection with COPsync's potential issuance of up to $25 million of its securities[1]

59.    This "shelf" registration statement covered COPsync's potential securities offerings—including "common stock, preferred stock, warrants and rights, or any combination"—"from time to time in indeterminate amounts and at indeterminate times."[2]

60.    The registration statement made clear that COPsync "may distribute" the securities "in one or more transactions" through various unspecified pricing mechanisms: "a fixed price or prices, which may be changed," "market prices prevailing at the time of sale," "prices related to such prevailing market prices," or "negotiated prices."

61.    The registration statement further noted that the "estimated expenses" in connection with any issuance and distribution of securities described in the statement were "not presently known because they depend upon, among other things, the number of offerings that will be made pursuant to this registration statement, the amount and type of securities being offered and the timing of such offerings."

62.    On July 13, 2016, the Commission declared COPsync's "shelf" registration statement effective.

---

[1]    A "shelf" registration statement allows an issuer in certain circumstances to offer securities to the public without a separate prospectus for each offering but instead with a single prospectus for multiple, indeterminate future offerings.

[2]    A warrant gives the holder the right to buy or sell a security, such as stock, at a certain price before the warrant's expiration.

63.     On August 19, 2016, COPsync's Board of Directors (the "Board") held an in-person meeting at the company's office in Addison, Texas.

64.     Brewer attended the entire meeting at the Board's invitation.

65.     At the meeting, the Board made no firm decisions about how to finance COPsync but discussed a potential sequence of funding events, including a bridge loan in August 2016 and an equity raise—that is, issuing stock to obtain capital—in September 2016.

66.     The Board also discussed the creation of a special financing committee to explore COPsync's financing options and invited Brewer to participate as an advisor to the committee.

67.     On November 14, 2016, COPsync filed its quarterly report on Form 10-Q for the quarter ending September 30, 2016.

68.     The Form 10-Q mentioned the Form S-3 registration statement but, like the Form S-3, did not specify any planned offering of stock, other than that stock "may be issued by [COPsync] from time to time in indeterminate amounts and at indeterminate times."

69.     On December 6, 2016, a firm that had performed investment banking functions for COPsync (the "Investment Bank") entered into an agreement—marked "confidential"—with COPsync to serve as its placement agent for a potential offering of two million shares of the company's stock.

70.     On December 8, 2016, COPsync's common stock price closed at $0.89 per share.

71.     On December 9, 2016, COPsync's Board held a meeting in New York, New York, in which some participants participated by phone and others appeared in person.

72.     Brewer attended the Board meeting in person.

73.     At the meeting, the Board decided that COPsync would offer up to two million freely-trading shares of its common stock, with each share sold as a "unit" with two warrants. Each warrant would entitle the holder to purchase an additional share of common stock.

74.     The Board proposed that the purchase price for each of these "units" would be the lesser of (a) the ten-day volume weighted average price of the common stock, measured as of the close of the market on the offering date, or (b) $0.90. The Board further proposed that the first of the two warrants in each "unit" would be exercisable for cash within six months at a price of $1.10 per share of common stock, and that the second warrant in each "unit" would be exercisable in cash or in a cashless exercise transaction within five years at a price of $1.25 per share of common stock.

75.     At the same meeting, the Board established a special pricing committee, consisting solely of COPsync's then-chief executive officer, to determine the final terms and conditions of the offering, including the pricing of the securities offering within specified parameters. Among other things, the Board resolved that the "units" could be sold at up to a 30% discount to the market price of COPsync's common stock without any further Board action or ratification.

76.     This information was confidential and non-public.

77.     On the afternoon of December 12, 2016, COPsync's CEO emailed Brewer documents relating to the proposed offering, including an investor presentation and a "Summary of Proposed Offering Terms for COPSync, Inc."

78.     The investor presentation, which itself contained a brief summary of the offering, bore the following legend in capital letters on the bottom of each page: "Strictly confidential. Not for distribution to the public."

79.     The second page of the investor presentation further stated: "This presentation is strictly confidential and may not be distributed to any other person, and may not be reproduced or published, in whole or in part, in any form. Failure to comply with this restriction may constitute a violation of applicable securities laws."

80.     The separate summary of the proposed offering terms made clear, among other things, that COPsync proposed to offer up to two million freely-trading shares of its common stock

13

in units comprised of one share of stock and two warrants and that the proposed purchase price for each of these "units" would be the lesser of the ten-day volume weighted average price of the common stock, measured as of the close of the market on the offering date, or $0.90.

81.     That afternoon, Brewer forwarded the email and attachments to the co-manager of an emerging growth fund (the "Fund Manager") with whom Brewer had done business before and copied two Brewer Group colleagues. Brewer wrote: "Let's discuss again if you can."

82.     Within an hour, one of Brewer's colleagues replied to Brewer's email and pointed out, among other things, that any purchasers in the offering would promptly sell their shares after receiving them once the transaction closed:

> Terms will end up being expensive money – this will be a death spiral if he [COPsync's CEO] can even raise the capital. For it not to be – it would have to be raised from complete new-to-the-game retail investors… Warrants will act as the asset and call option to upside for investors, as the common gets flushed into market on close of transactions.

83.     On December 21, 2016, Brewer emailed COPsync's corporate counsel and asked her: "Any eta on the terms of the equity financing? Is that still happening this week?"

84.     Later the same day, Brewer received another email from the Fund Manager, who noted "the discounted purchase or any downside movement on the stock"—meaning the offering's discounted share price and COPsync's expected stock price decline after the company announced the offering and the investors in the offering sold their shares.

85.     In an email that evening, Brewer made clear to the Fund Manager that the Brewer Group planned to invest in the COPsync offering.

86.     On December 21, 2016, Brewer received by email a copy of the securities purchase agreement (the "Purchase Agreement") to participate in COPsync's offering.

87.     The Purchase Agreement contained a clause entitled "Certain Transactions and Confidentiality," by which each purchaser in the offering agreed:

[N]either it nor any [a]ffiliate acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including [s]hort [s]ales of any of [COPsync's] securities during the period commencing with the execution of this Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release [described above]. Each [p]urchaser… covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by [COPsync] pursuant to the initial press release [described above], such [p]urchaser will maintain the confidentiality of the existence and terms of this transaction….

88.     On December 28, 2016, the Brewer Group's chief operating officer emailed Brewer's signed signature page on the Purchase Agreement, which Brewer had signed on the Brewer Group's behalf, to COPsync and copied Brewer on the email.

## V.     BREWER SOLD SHARES OF COPSYNC TO MAXIMIZE HIS PROFIT BEFORE COPSYNC ANNOUNCED THE OFFERING.

89.     On or about January 4, 2017, Brewer directly or indirectly instructed his Manhattan-based broker to sell shares of COPsync from Brewer's personal brokerage account.

90.     On January 4, 2017, Brewer's broker executed Brewer's sale of 5,000 shares of COPsync at a price of approximately $1.01 per share, for total proceeds of $5,063.88.

91.     That evening, Brewer received an email from his broker informing him that the sale of the COPsync shares had been executed and that the broker would sell more shares the next day.

92.     On January 5, 2017, Brewer's broker sold an additional 95,000 shares of COPsync from Brewer's brokerage account at prices ranging from approximately $1.01 to $1.16 per share, for total proceeds of $99,114.29.

93.     Before selling his stock, Brewer did not seek COPsync's consent to do so or disclose to COPsync that he intended to do so.

94.     On January 5, 2017, COPsync's shares of common stock closed at a price of $1.03 per share.

95.     On the morning of January 6, 2017, COPsync issued a press release announcing the offering and disclosing that it had sold 1,772,614 shares of common stock, as well as warrants to

purchase additional shares. The press release stated that the price to purchase one common stock share, one Class A warrant, and one Class B warrant combined was $0.65.

96.     Over the course of the day, the volume of trading in COPsync's stock more than tripled from the previous day, and the stock price closed that day at $0.69 per share—approximately a 30% drop from the prior day's closing price.

97.     By selling 100,000 shares on January 4 and 5, rather than waiting until after COPsync announced the offering on January 6, Brewer profited by approximately $35,000 more than he otherwise would have.

98.     The Brewer Group never obtained any COPsync stock pursuant to the Purchase Agreement. Shortly after the offering closed, the Brewer Group assigned its rights to purchase COPsync stock under the Purchase Agreement to a third party.

99.     Later in January 2017, the Financial Industry Regulatory Authority, a self-regulatory organization, began a review of trading in COPsync shares around the time of the offering.

100.     As part of this review, COPsync reached out to certain individuals who had been privy to information about events leading up to the offering announcement, including Brewer.

101.     Brewer refused to respond to COPsync's inquiry.

## VI.     BREWER AIDED AND ABETTED BREWER CAPITAL'S FAILURE TO REASONABLY ESTABLISH AND ENFORCE WRITTEN POLICIES CONCERNING THE MISUSE OF MATERIAL, NONPUBLIC INFORMATION.

### A.     Background: Advisers Act Section 204A and Rule 204A-1 Thereunder

102.     Advisers Act Section 204A and Rule 204A-1 together serve to ensure that investment advisers establish, maintain, and enforce written policies to prevent advisory firms, their control persons, and their employees from misusing material, nonpublic information.

103.     Advisers Act Section 204A requires investment advisers to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of

the investment adviser's business, to prevent the misuse of material, nonpublic information by the investment adviser or any person associated with the investment adviser, including any person who directly or indirectly controls the investment adviser.

104.    Rule 204A-1 requires investment advisers to "establish, maintain and enforce a written code of ethics."

105.    The required code of ethics must include at least (a) a standard of business conduct, reflecting the adviser's fiduciary obligations, that the adviser requires of its supervised persons, (b) provisions that require persons with access to certain nonpublic information or persons involved in making securities recommendations to clients to periodically report personal securities transactions and holdings, and (c) provisions requiring supervised persons to acknowledge in writing their receipt of the code of ethics.

**B.    Brewer Capital Failed to Reasonably Design and Enforce Its Code of Ethics and Written Supervisory Procedures, and Brewer Aided and Abetted Brewer Capital's Failure.**

106.    From at least 2015 through November 2017, Brewer, as Brewer Capital's manager and majority owner (through his ownership of the Brewer Group), made Brewer Capital's trading decisions.

107.    During the same period, Brewer and others who worked at Brewer Capital also performed work for one or more of Brewer Capital's affiliated firms under the Brewer Group umbrella, including Brewer Consulting.

108.    During the same period, Brewer and other Brewer Capital employees repeatedly obtained material, non-public information about securities based on their work on behalf of securities issuers for Brewer Capital's affiliated firms, including Brewer Consulting.

109.    For example, Brewer and others at Brewer Capital obtained material non-public information about COPsync pursuant to the consulting agreement between Brewer Consulting and

COPsync described above in paragraphs 36 through 48 and pursuant to the endorsement agreement between Brewer and COPsync described above in paragraphs 49 through 55.

110.    During the same period, Brewer Capital had written supervisory procedures whose purpose was to "provide personnel with an awareness of the requirements of the law, rules and regulations governing investment adviser and investment-Advisory representative activities; and … provide procedural means necessary to ensure that the operations of the Firm meet those requirements," including the descriptions of insider trading prohibitions described above in paragraphs 32 through 35.

111.    The written supervisory procedures for at least 2015 and 2016 provided that Brewer Capital's "access persons"—which included employees, directors, officers, partners and members of Brewer Capital who had access to non-public information regarding advisory clients' purchases or sales of securities or who made securities recommendations to clients—were required, when they had any question as to whether information in their possession was material or non-public, to "[r]eport the matter immediately to the CCO [chief compliance officer]" and "[r]efrain from the purchase or sale of [the] securities on behalf of themselves or others."

112.    The same supervisory procedures also provided that a Brewer Capital access person "may not buy or sell any security in which the person had a beneficial ownership unless the transaction occurred in an exempted security or the employee has complied with the Personal Security Transaction Policy." That policy in turn required the access person to complete Brewer Capital's pre-clearance form and submit that form to the chief compliance officer ("CCO") for review before making any such securities transaction.

113.    These supervisory procedures further provided that Brewer Capital access persons were required to have written pre-clearance for personal securities transactions when the securities were (1) on the restricted security list—that is, a list of securities that a firm prohibits its employees

from buying or selling, typically because of access to material, non-public information about the securities; (2) on the security watch list—a list of securities that a company selects for special surveillance as to potential transactions by employees; (3) offered in an initial public offering; (4) offered in a private placement—a sale of securities to pre-selected investors, rather than to the public; or (5) offered in a limited offering—an offering exempt from registration under the Securities Act of 1933. In each of those instances, the supervisory procedures required access persons to complete Brewer Capital's pre-clearance form.

114.    From at least 2015 through November 2017, Brewer Capital's written supervisory procedures included a Code of Ethics.

115.    The Code of Ethics provided that access persons "may be subject to a blackout period from trading" in thinly traded securities, defined as securities with average daily trading volume below 100,000 shares.

116.    The Code of Ethics further made clear: "[Brewer Capital] and its employees generally may not participate in private placements or initial public offerings (IPOs) without pre-clearance from [Brewer Capital]'s Compliance Officer."

117.    In 2016, Brewer held joint responsibility, together with Brewer Capital's CCO, for reading and updating Brewer Capital's supervisory procedures and Code of Ethics.

118.    In 2016, Brewer and the CCO likewise held joint responsibility for conducting the annual employee compliance training.

119.    From at least 2015 through November 2017, Brewer Capital did not enforce the procedures in the written supervisory procedures and Code of Ethics described above in paragraphs 32 through 35 and 111 through116.

120.    For example, during at least that period, Brewer Capital did not keep a restricted list or watch list to track stocks for which the firm had obtained material, non-public information.

121.     During at least the same period, Brewer Capital did not impose blackout periods for trading thinly traded securities.

122.     Before July 2017, Brewer Capital did not enforce its pre-clearance policies for trading.

123.     From at least 2015 through at least July 2017, Brewer never submitted any Personal Trading Pre-Clearance forms and from at least 2015 through November 2017, Brewer never consulted any restricted list or watch list before engaging in securities transactions, because no such lists existed.

124.     From 2015 through November 2017, Brewer (on Brewer Consulting's behalf) negotiated and entered into consulting agreements with at least nine issuers, pursuant to which Brewer Consulting performed services and received or had the potential of receiving material non-public information.

125.     From at least 2015 through November 2017, Brewer negotiated and entered into personal endorsement agreements with three of those same issuers.

126.     Brewer Capital's 2015 and 2016 written supervisory procedures and Code of Ethics failed to establish procedures reasonably designed to prevent Brewer and other Brewer Capital employees from misusing material, non-public information they obtained as a result of their responsibilities at Brewer Capital's affiliated entities.

## VII.   BREWER ACTED AS AN UNREGISTERED BROKER.

127.     From April 2015 through July 2017, Brewer was not associated with any broker-dealer or registered with the Commission as a broker-dealer.

128.     During this period, Brewer worked with microcap companies to provide advice on raising capital, to introduce the companies to sources of capital, and to identify potential investors.

129.   For example, on June 26, 2015, Brewer Consulting entered into an agreement with a microcap company, Issuer A, to provide global business development and marketing consulting services, including to "work on the Company's behalf with investment banking firms and potential investors…."

130.   This agreement was extended several times.

131.   For this and other services, Issuer A agreed to pay Brewer Consulting an advisory fee of $2,000 per month and to issue 500,000 shares of restricted common stock to the Brewer Group each quarter.

132.   As reported in Issuer A's annual report on Form 10-K for the year ended December 31, 2016, "the Brewer Group … arranged a number of meetings with various hedge funds in New York to assist with the funding of the company."

133.   Similarly, Brewer Consulting entered into an agreement, effective February 10, 2017, with another microcap company, Issuer B, to represent the company by "providing ongoing support including, but not limited to, facilitating introductory meetings with financial firms and institutional investors."

134.   For this and other services, Issuer B agreed to issue 800,000 shares of restricted common stock and 800,000 warrants spread out over quarterly payments to the Brewer Group.

135.   Issuer B's Chairman of the Board of Directors repeatedly asked Brewer to introduce him to potential investors.

136.   Brewer repeatedly solicited investments in Issuer B.

137.   Similarly, as a consultant to COPsync, Brewer identified and communicated with potential purchasers of COPsync's securities, solicited securities transactions, and had his advisory clients purchase COPsync securities.

138.     For these and other services, Brewer received cash and COPsync shares from COPsync.

139.     In August 2016, COPsync's CEO requested that the Brewer Group provide a bullet point list of the top accomplishments that the Brewer Group had achieved for COPsync because the CEO was expecting a "rigorous review" of the relationship from COPsync's Board and wanted help articulating "the value created versus the expense incurred."

140.     The Brewer Group's response stated that Brewer Consulting was "instrumental in COPsync's NASDAQ uplisting and ongoing capital markets support."

141.     The response further explained that Brewer Consulting "provides ongoing capital markets support including facilitating introductions to various investment bankers including [the Investment Bank] surrounding COPsync's uplisting transaction as well as to several private investors, research analysts, etc. leading up to, during and following the Company's successful uplist to the NASDAQ stock exchange market."

142.     In a follow-up email reviewed by Brewer, the Brewer Group added:

> Given his background, vast network, and extremely established relationships in the space including with public and private investors and high-net-worth individuals, Jack Brewer was instrumental in helping COPSync with the NASDAQ uplisting process and provides ongoing capital markets support including facilitating introduction to various investment bankers … surrounding COPSync's uplisting transaction as well as to several private investors, research analysts, etc. leading up to, during and following the Company's successful uplist to the NASDAQ stock exchange market.

143.     The email also included a breakdown of the nearly $2.8 million of investments in COPsync securities made as a result of Brewer's introductions.

144.     This amount included investments made by four Brewer Capital clients as well as "over $500,000 in open market support from various investors."

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

145.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 8, 15 through 101, and 106 through 126.

146.    Defendant, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

147.    By reason of the foregoing, Defendant, directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 204A of the Advisers Act and Rule 204A-1 Thereunder

148.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 8, 15 through 126, and 128 through 138.

149.    Brewer Capital, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of its business, to prevent the misuse in violation of the Advisers Act [15 U.S.C. § 80b-1 et seq.] or the Exchange Act [15 U.S.C. § 78a et seq.], or the rules or regulations thereunder, of material nonpublic information by such investment adviser or any person associated with such investment adviser.

150.     Brewer Capital, while acting as an investment adviser failed to establish, maintain, and enforce a written code of ethics that includes at least (a) a standard of business conduct, reflecting the adviser's fiduciary obligations, that the adviser requires of its supervised persons, (b) provisions that require persons with access to certain nonpublic information or persons involved in making securities recommendations to clients to periodically report personal securities transactions and holdings, and (c) provisions requiring supervised persons to acknowledge in writing their receipt of the code of ethics.

151.     By reason of the foregoing, Brewer Capital violated Section 204A of the Advisers Act [15 U.S.C. § 80b-4a] and Rule 204A-1 promulgated under the Advisers Act [17 CFR § 275.204A-1].

152.     Defendant, directly or indirectly, aided and abetted Brewer Capital's primary violations of Section 204A of the Advisers Act and Rule 204A-1 thereunder because he knowingly or recklessly provided substantial assistance to Brewer Capital's violation of Section 204A and Rule 204A-1.

## THIRD CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act

153.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1, 9, 15 through 28, 36 through 57, and 127 through 144.

154.     Defendant, a natural person not associated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the Commission as a broker-dealer.

155.     By reason of the foregoing, Defendant violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### I.

Permanently enjoining Brewer and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] and from aiding and abetting any violation of Section 204A of the Advisers Act [15 U.S.C. § 80b-4a] and Rule 204A-1 [17 C.F.R. § 275.204A-1];

### II.

Ordering Brewer to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Brewer to pay civil monetary penalties under Exchange Act Section 21A [15 U.S.C. §78u-1] on the Commission's first claim for relief; ordering Brewer to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] on the Commission's second claim for relief; and ordering Brewer to pay civil monetary penalties under Advisers Act Section 209(e) [15 U.S.C. § 80b-9] on the Commission's third claim for relief;

### IV.

Permanently prohibiting Brewer from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## V.

Granting any other and further relief this Court may deem just and proper.


Dated:    August 6, 2020
          New York, New York

                              <u>        /s/ Marc P. Berger        </u>
                              MARC P. BERGER
                              REGIONAL DIRECTOR
                              Lara S. Mehraban
                              Preethi Krishnamurthy
                              Sheldon L. Pollock
                              Todd Brody
                              Bennett Ellenbogen
                              Lindsay S. Moilanen
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              Brookfield Place
                              200 Vesey Street, Suite 400
                              New York, New York 10281-1022
                              (212) 336-0080 (Brody)
                              <u>brodyt@sec.gov</u>