UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>JACK BREWER,<br><br>                              Defendant. | 20 Civ. 06175 (JHR)<br><br><u>OPINION & ORDER</u> |

JENNIFER H. REARDEN, District Judge:

Plaintiff, the U.S. Securities and Exchange Commission (the "SEC"), brought this

enforcement action against Defendant Jack Brewer, a professional football player turned

investment advisor, alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a

*et seq.*, the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b *et seq.*, and the regulations

promulgated under those statutes.  *See* ECF No. 1 (Compl.).[1]  The SEC asserted claims

for violations of (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5; and (2) Section 15(a) of the Exchange Act, 15 U.S.C.

§ 78o(a); as well as for aiding and abetting violations of (3) Section 204A of the Advisers Act,

15 U.S.C. § 80b-4a, and Rule 204A-1 thereunder, 17 C.F.R. § 275.204A-1.

Following discovery, the SEC moved for partial summary judgment on its claim for

violations of Section 10(b) and Rule 10b-5.  ECF No. 74 (Mot.).[2]  The Court granted the SEC's

motion.  ECF No. 87.  This Opinion sets forth the context and bases for that ruling.

---

[1] The case was originally assigned to the Honorable Paul G. Gardephe and reassigned to this
Court in 2023.

[2] The SEC did not seek summary judgment on its claims for aiding and abetting violations of
Section 204A of the Advisers Act and Rule 204A-1 thereunder, *see* Compl. ¶¶ 148-52, or for
violations of Section 15(a) of the Exchange Act, *see id.* ¶¶ 153-55.

# I.    BACKGROUND

## A.    Factual Background[3]

### i.    Brewer's Experience as a Securities Professional

Brewer was a professional football player in the National Football League from approximately 2002 to 2007.  ECF No. 74-1 (Pl.'s 56.1 ¶ 2).  After retiring, he accepted a position as a Wealth Manager with Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch").  *Id.* ¶ 3.  In late 2007, Brewer took and passed his Series 7 securities examination—an exam that "measures the degree to which each candidate possesses the knowledge needed to perform the critical functions of a general securities representative," *id.* ¶ 5—and received his Series 7 securities license, *id.* ¶ 4.  The Series 7 exam includes a section concerning the prohibition against trading while in possession of material non-public information.  *Id.* ¶ 7.[4]

Brewer possessed extensive knowledge regarding securities practice.  *See generally id.* ¶¶ 1-10.  After obtaining his Series 7 license, Brewer had a successful career with Merrill Lynch,

---

[3] The facts herein are drawn from the SEC's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute in Support of its Motion for Summary Judgment Against Defendant Jack Brewer pursuant to Local Civil Rule 56.1(a) ("Pl.'s 56.1").  Brewer failed to file a document containing "a correspondingly numbered paragraph responding to each numbered paragraph" in the SEC's 56.1 Statement, as required by Local Civil Rule 56.1(b).  Because the SEC's Rule 56.1 Statement was not "specifically controverted," each numbered paragraph therein is "deemed to be admitted for purposes of the motion."  *See* Local Civ. R. 56.1(c).  The "Court accepts the facts put forward in [the SEC's] 56.1, noting any disagreement where appropriate."  *See S.E.C. v. Afriyie*, No. 16 Civ. 2777 (JSR), 2018 WL 6991097, at *1 n.1 (S.D.N.Y. Nov. 26, 2018), *aff'd*, 788 F. App'x 59 (2d Cir. 2019) (granting SEC's motion for summary judgment on insider trading claim); *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) ("[T]he failure to respond [to a Local Rule 56.1 statement] may allow the district court to accept the movant's factual assertions as true.").  Although Brewer's Memorandum of Law refers to an "Affidavit of Jack Brewer" (Opp. at 5), "Brewer's counsel did not serve any such affidavit on the SEC and did not respond to the SEC's email to him confirming the documents the SEC had received in support of Brewer's Opposition."  Reply at 12 n.6.  Brewer's counsel did file an affidavit attaching selected deposition exhibits.  *See* ECF No. 82 (Affidavit of Lee A. Hutton, III).  For consistency, the Court cites to the numbers that were assigned to those exhibits in the SEC's submission.  *See* ECF No. 86.

[4] In 2008, Defendant also obtained a Series 66 securities license, *id.* ¶ 8.

ranking in the top one percent in his class across the firm. *Id.* ¶ 9. From 2007 through 2017, Brewer was associated with six SEC-registered broker dealers. *Id.* ¶ 10. Brewer also completed Executive Business Programs at the Harvard School of Business in 2005 and the Wharton School of Business in 2006. *Id.* ¶ 20. He pursued an M.B.A. degree at the University of Miami, *id.* ¶ 20, and attended a masters' program at Columbia University, *id.* ¶ 21.

ii.      *The Brewer Group and Affiliated Entities*

While still playing for the New York Giants, Brewer founded The Brewer Group, Inc. (the "Brewer Group"), which described itself as a "private investment fund." *Id.* ¶ 11. Brewer owned 100% of the Brewer Group and was its chief executive officer. *Id.* ¶ 13. This holding company, *see id.* ¶ 12, contained several portfolio companies, including BSI Wealth Management LLC d/b/a Brewer Capital Management ("Brewer Capital"), an SEC-registered investment adviser, *id.* ¶ 15, and Brewer & Associates Consulting, LLC ("Brewer & Associates"), *id.* ¶ 22. Brewer was the portfolio manager for the Brewer Group, meaning that he oversaw all of the companies under the Brewer Group umbrella. *Id.* ¶ 14.

iii.     *Brewer Capital's Insider Trading Policies and Brewer's Awareness Thereof*

Brewer Capital policy prohibited trading while in possession of insider knowledge, as Brewer was aware. *See generally id.* ¶¶ 26-45. Brewer Capital had a Compliance Manual and Written Supervisory Procedures ("WSPs"). *Id.* ¶ 26. On October 25, 2016, Brewer received the WSPs by email from Jesse Meehan ("Meehan"), the Chief Compliance Officer of Brewer Capital, *id.* ¶ 27, and Chief Operating Officer of the Brewer Group, *id* ¶ 28. The WSPs stated that, "as you are responsible for ensuring your familiarity with statutes and rules governing your actions, we expect you to be thoroughly familiar with our procedures and policies set forth in this manual." *Id.* ¶ 30. Pursuant to the WSPs, all persons associated with Brewer Capital were "prohibited from engaging in any securities transaction . . . while in possession of [a.] Material,

non-public information concerning such securities which is known to [] any person by virtue of his position as an insider with respect to the issuer of such securities . . . [b.] Material, nonpublic information concerning such securities where the information has been obtained by []any person either through theft or misappropriation[.]" *Id.* ¶ 33. The WSPs defined the term "insider" to "include officers, directors, or supervised persons of a company as well as 'temporary insiders,' which the WSPs explained are persons who 'enter[] into a special confidential relationship in the conduct of a company's affairs and as a result [are] given access to information solely for the company's purposes.'" *Id.* ¶ 34. According to the WSPs, "'temporary insiders' can include 'a company's attorneys, accountants, *consultants*, *advisers*, bank lending officers, and the Access Persons of such organizations.'" *Id.* ¶ 35 (emphasis added). Further, "material information" was defined as "information which a reasonable investor would consider important in making his or her investment decisions, or information which is reasonably certain to have a substantial effect on the price of a company's securities." *Id.* ¶ 36. The WSPs also provided that, "if Brewer was unsure whether acting on the information would be in violation of the law, he was required to refrain from trading and have 'immediate' conversations with Meehan." *Id.* ¶ 38.

Brewer understood that information concerning private placements of securities was material information. *Id.* ¶ 42. The WSPs required that each person acknowledge his or her receipt thereof. *Id.* ¶ 29. In addition, Brewer reviewed and discussed the insider trading policies with Meehan and with Brewer Capital's compliance attorneys. *Id.* ¶ 39.[5] Accordingly, Brewer understood "what it meant to be an insider." *Id.* ¶ 45.

---

[5] The SEC suggests that, "[a]s a person in the securities industry[,] Brewer thought about the issue of whether information that he possessed was material non-public information." *Id.* ¶ 44. The Court "declines to credit [this] conclusory statement[]." *Cf. Nguedi v. City of New York*, No. 16 Civ. 4430 (RA), 2018 WL 4636837, at *2 (S.D.N.Y. Sept. 27, 2018), *aff'd sub nom. Nguedi v. Caulfield*, 813 F. App'x 1 (2d Cir. 2020) (disregarding "conclusory allegations").

     *iv.*     *Brewer's Relationship with Copsync Inc.*

In August 2015, Brewer & Associates entered into a business development and marketing services agreement (the "Advisory Agreement") with Copsync Inc. ("Copsync"), *id.* ¶ 50—a public company whose core business was selling "a real-time, in-car information sharing, communication and data interoperability network for law enforcement agencies," *id.* ¶ 47. Copsync was a Delaware corporation with its principal place of business in Addison, Texas. *Id.* ¶ 46. Copsync's common stock was listed on the NASDAQ Capital Market Exchange ("NASDAQ") under the symbol "COYN." *Id.* ¶ 48. Brewer signed the Advisory Agreement in his capacity as CEO of Brewer & Associates. *Id.* ¶ 55. The Advisory Agreement provided that Brewer & Associates would participate in Company conference calls and meetings as requested. *Id.* ¶ 51 (citing Ex. 15). It contained a confidentiality provision stating that Brewer & Associates would "maintain in confidence all proprietary, non-published information obtained by [Brewer & Associates] with respect to the Company during the course of the performance of [Brewer & Associates's] services hereunder, and [Brewer & Associates] shall not use any of the same for its own benefit." *Id.* ¶ 52 (citing Ex. 15). In exchange for its services under the Advisory Agreement, Brewer & Associates was to receive both cash and restricted stock. *Id.* ¶ 54.

On December 1, 2015, Brewer & Associates and Copsync entered into an agreement expanding Brewer & Associates's services (the "Expansion Agreement"). *Id.* ¶ 56. Pursuant to the Expansion Agreement, all of the terms and provisions in the Advisory Agreement were ratified and confirmed in all respects except to the extent that the Expansion Agreement expressly amended the Advisory Agreement. *Id.* ¶ 57. Brewer signed the Expansion Agreement as CEO of Brewer & Associates. *Id.* ¶ 59.

A month later, on January 1, 2016, Brewer entered into a personal endorsement agreement with Copsync, (the "Endorsement Agreement"). *Id.* ¶ 60. Pursuant to the

Endorsement Agreement, Brewer agreed, in his individual capacity, "to '[e]ndorse and serve as a public facing figure for' Copsync." *Id.* (quoting Ex. 20). The Endorsement Agreement was also signed by Brewer. *Id.* ¶ 61. It contained a confidentiality provision, which provided that Brewer would have access to Copsync's confidential and proprietary information. *Id.* Brewer "agree[d] to hold in trust and confidence all Confidential Information disclosed to [him] and further agree[d] not to exploit or disclose the Confidential Information to any other person or entity or use the Confidential Information directly or indirectly for any purpose other than for [Brewer's] work with the Company." *Id.* (quoting Ex. 20).

Because of his role as a consultant to Copsync—and as a key public face for the company—Brewer was granted access to high-level, sensitive meetings, which provided him with at least some information regarding internal deliberations. *See generally, e.g.*, *id.* at ¶¶ 51, 64, 65. Brewer attended a Copsync Board of Directors Meeting in Dallas in August 2016, for instance. *Id.* ¶ 64. He was also invited to Copsync's "Trusted Advisors Meeting" in New York on December 9, 2016, although he testified that "when he arrived at the meeting location, the meeting was over." *Id.* ¶ 65.

In exchange for his services, Brewer was to receive both cash and restricted stock. *Id.* ¶ 62. Pursuant to the Endorsement Agreement, Copsync irrevocably agreed to issue and deliver 200,000 shares of Copsync restricted common stock to Brewer. *Id.* ¶ 66. In its Q1 2016 Form 10-Q, Copsync disclosed that the shares issued to Brewer were valued at $2.06, *id.* ¶ 68, which was "[t]he closing price for Copsync stock on December 31, 2015," *id.* ¶ 67. Copsync actually issued the first 100,000 shares of its restricted stock to Brewer pursuant to the Endorsement Agreement on approximately February 12, 2016. *Id.* ¶ 69. Brewer deposited those shares in his account at Alpine Securities. *Id.* ¶ 71. Then, in August 2016, Brewer transferred the 100,000 restricted Copsync shares to his personal account at Morgan Stanley Smith Barney LLC. *Id.*

6

¶ 72.  On September 14, 2016, Brewer instructed Chief Compliance Officer and Chief Operating Officer Meehan, by text message, to "get the restricted legend removed from the 100,000 shares of Copsync that Brewer [had] received pursuant to the Endorsement Agreement."  *Id.* ¶ 74.  A week later, on September 21, 2016, Meehan sent Brewer's broker at Morgan Stanley the documentation necessary for Morgan Stanley to facilitate removal of the restricted legend from those shares.  *Id.* ¶ 75.  In the "Rule 144 Non-Affiliate Seller's Representation Letter," Brewer represented that he "was not and had not been an 'affiliate' of Copsync, a term which the form defined as 'a person that directly or indirectly, through one of more intermediaries, controls, or is controlled by or is in common control with' Copsync," *id.* ¶ 78 (quoting Ex. 29), and "that the 100,000 shares of Copsync [had been] beneficially owned by him for a period of at least six months," *id.* ¶ 79.

Brewer's broker received written approval from Copsync for Brewer to sell his restricted shares on November 28, 2016.  *Id.* ¶ 85.  By November 30, 2016, Brewer was free to sell or trade the 100,000 shares of Copsync that he had received pursuant to the Endorsement Agreement.  *Id.* ¶ 88.  Brewer exchanged the 100,000 restricted shares for freely trading Copsync shares on approximately November 30, 2016.  *Id.* ¶ 87.  Brewer sold those securities prior to March 29, 2017, which was the expiration date for Morgan Stanley's permission to sell the securities.  *Id.* ¶ 86.

v.    *Copsync's Need to Raise Money to Fund Operations and to Meet NASDAQ's Requirements*

Although Copsync had incurred some losses since its founding, *id.* ¶ 89, its performance began to decline appreciably in 2016.  The company sustained losses from operations in each of the first three quarters of 2016.  *Id.* ¶¶ 90-92.  In May 2016, Brewer was informed (and "responded that he was aware") that Copsync's "burn rate" (i.e., the company's cash spending

rate) was $1 million/month and that, given this rate of spending, Copsync would run out of cash by August 2016. *Id.* ¶ 94. Copsync's financial condition continued to deteriorate, *id.* ¶¶ 95-98, and "Brewer was aware of Copsync's financial condition 'as much as [he] could have been.'" *Id.* ¶ 99 (quoting Ex. 2 (Brewer Dep. Tr.) at 79:13-15).

On May 20, 2017, Copsync filed a Form 8-K disclosing that it had received notice from NASDAQ that it no longer met NASDAQ's continuing listing requirements. *Id.* ¶ 100. Brewer "knew that 'a delisting [wa]s never good' and c[ould] have a negative impact on a company's stock price and c[ould] also have a negative impact on a company's ability to raise capital in the future." *Id.* ¶ 103 (quoting Brewer Dep. Tr. 95:23-96:14). But "[t]he only realistic way for Copsync to meet NASDAQ's continuing listing requirement at th[at] time was to increase its stockholder equity by selling stock." *Id.* ¶ 102. On May 27, 2016, Copsync's CEO Ronald Woessner emailed Brewer that "the amount that the company needed to raise to meet the NASDAQ continuing listing requirement (as of June 30, 2016) was $3 million." *Id.* ¶ 104.

Copsync filed a Form S-3 registration statement with the SEC on July 1, 2016, *id.* ¶ 107, which was declared effective on July 13, 2016. *Id.* ¶ 108. The Form S-3 did not disclose any information regarding specific amounts, prices, or terms of securities to be offered pursuant to the registration statement. *Id.* ¶ 110. At some point between July and September 2016, Woessner told Brewer that the S-3 Offering, when it happened, would be for $4 million. *Id.* ¶ 111.

On October 26, 2016, Woessner emailed Brewer a copy of an October 16, 2016 research report on Copsync prepared by equity research company Sidoti & Company, LLC ("Sidoti"). *Id.* ¶¶ 112, 114. Sidoti's October 16 research report estimated that Copsync would suffer net losses through 2018, and the model included in the report did not reflect any profitable years. *Id.* ¶ 116. The report noted that "Copsync [wa]s not yet profitable and require[d] external funding to build

out its business, which could dilute current shareholders." *Id.* ¶ 117 (quoting Ex. 45). The report also stated that Copsync was "not compliant with NASDAQ listing requirements and could face de-listing if it d[id] not raise" a sum of "$4-$5 million in equity." *Id.* ¶¶ 117-18. Brewer forwarded the Sidoti report to Meehan and to Chase Womack, the Chief Investment Officer of the Brewer Group. *Id.* ¶ 115.

     *vi.*    *Copsync's December 2016 Offering of Securities*

On November 18, 2016, Copsync filed a Form 8-K disclosing that, "unless the company timely requested a hearing with NASDAQ, its securities were subject to suspension and subsequent delisting from the exchange and that the company planned to present a plan to the NASDAQ to satisfy the $2.5 million stockholder's equity requirement." *Id.* ¶ 120. The Company then considered possible ways to raise the required capital to meet the NASDAQ listing obligations. At a December 9, 2016 board meeting, Copsync's Board of Directors authorized conducting a securities offering of up to 2 million shares of the company's common stock, along with up to 200% warrant coverage to purchase additional Copsync shares (the "Offering"). *Id.* ¶ 121. On December 12, 2016, Woessner sent Brewer an email attaching three documents relating to the Offering: (a) an investor presentation; (b) a summary of proposed offering terms; and (c) a contact sheet. *Id.* ¶ 122.

The investor presentation stated that the Offering was for the sale of up to 2 million units, which included common stock and warrants. *Id.* ¶ 123. The summary of proposed offering terms also included that each share of common stock would be accompanied by two warrants representing the right to purchase one additional share of common stock (the "Unit"); and that the purchase price for each Unit would be "the lesser of (a) the 10-day volume weighted average price of the common stock measured as of the close of market on the date of the offering, or (b) $0.90." *Id.* ¶ 127. The $0.90 maximum price of the offering for each Unit was below the

market price for Copsync common stock on the date when Copsync emailed the investor presentation and summary of proposed offering terms to Brewer.  *Id.* ¶ 130.  Moreover, when including the value of the warrants, "the maximum offering price of $0.90 per unit represent[ed] a discount of at least 25% relative to contemporaneous market prices for COPsync's stock and warrants."  *Id.* ¶ 130.  Brewer was aware that, "[u]sually in a secondary offering . . . the price of the stock goes down after the offering is announced."  *Id.* ¶ 131.

Brewer was informed that the information he had received was confidential.  "On each page, the investor presentation stated that it was 'strictly confidential, not for distribution to the public.'"  *Id.* ¶ 124 (quoting Ex. 49).  The investor presentation contained a confidentiality provision which further provided that "this presentation is strictly confidential and may not be distributed to any other person, and may not be reproduced or published, in whole or in part, in any form.  Failure to comply with this restriction may constitute a violation of applicable securities laws."  *Id.* ¶ 125 (quoting Ex. 49).

The price for a share of Copsync common stock was $0.95 at the market's close on Friday, December 9, 2016.  *Id.* ¶ 128.  On Monday, December 12, 2016, Brewer forwarded the email from Copsync's CEO containing the investor presentation, summary of proposed offering terms, and contact sheet to the Brewer Group's Chief Investment Officer Womack, and to another individual stating:  "Let's discuss again if you can." *Id.* ¶ 133 (quoting Ex. 52).  That day, the price of a share of Copsync common stock was $0.96 at the market's close.  *Id.* ¶ 129. The same day, Womack responded to Brewer by email: "Terms will end up being expensive money—this will be death spiral deal if he can even raise the capital.  For it not to be—it would have to be raised from complete new-to-the-game investors.  Warrants will act as the asset and call option to upside for investors, as the common gets flushed into the market on close of transaction."  *Id.* ¶ 134 (quoting Ex. 52).

On or about December 16, 2016, Brewer signed a waiver that Copsync had provided, which reiterated that Copsync was "proposing to sell 2 million shares of its common stock along with warrants to purchase up to an amount of 200% of the number of shares sold, but stated that the number of securities sold as well as their price was subject to change." *Id.* ¶ 137. On December 21, 2016, Copsync's investment banker sent Brewer by email a copy of the Securities Purchase Agreement for the Offering. *Id.* ¶ 138. Section 4.14 of the Securities Purchase Agreement provided that "[e]ach Purchaser . . . covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the initial press release . . . such Purchaser will maintain the confidentiality of the existence and terms of this transaction." *Id.* ¶ 139 (quoting Ex. 54). That section also provided that "[e]ach Purchaser . . . covenants that neither it nor any Affiliate acting on its behalf . . . will execute any purchases or sales, including Short Sales or any of the Company's securities during the period commencing with the execution of this Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the initial press release." *Id.* ¶ 140 (quoting Ex. 54).

On December 22, 2016, Chief Compliance Officer and Chief Operating Officer Meehan texted Brewer that "the amount of proceeds that Copsync was going to raise in the Offering was $1.08 million." *Id.* ¶ 141. In other words, according to Meehan, the Offering was likely to raise less than the $2.5 million necessary to meet the NASDAQ stockholder's equity requirement. *See id.* ¶ 120.

Brewer instructed Meehan by text on December 27, 2016 to "[s]ign and send the [Securities Purchase Agreement] tomorrow am." *Id.* ¶ 142 (quoting Ex. 56). Meehan emailed the signed Securities Purchase Agreement to Copsync's investment bankers on December 28, 2016. *Id.* ¶ 143. The email was also sent to Brewer and to Copsync senior management. *Id.*

11

¶ 143.  That same day, Woessner conveyed to Brewer by email that Copsync did not have

sufficient funds to cover payroll and other expenses.  *Id.* ¶ 144.

      *vii.*    *Brewer's Sale of His Copsync Stock*

      In light of that news, on January 4, 2017, Brewer instructed Meehan by text message to

facilitate the sale of his shares of Copsync.  *Id.* ¶ 145.  Specifically, Brewer and Meehan had the

following exchange:

> Meehan:  You see COYN [Copsync]
> Brewer:  Clear that [expletive]!!
> Meehan:  … [Broker] has 100k in your account ready. What do
> you want to trade it at?
> Brewer:  $1.00
> Meehan:  All 100k?
> Brewer:  5k a day.
> Meehan:  On it.

*Id.* ¶ 145 (quoting Ex. 59) (modifications in original).  Meehan texted Brewer's broker and,

pursuant to Brewer's instructions, placed an order to sell 5,000 shares per day of Copsync stock

at $1.00.  *Id.* ¶ 146.  That day, Brewer sold 5,000 shares of Copsync.  *Id.* ¶ 147.  The price at

which Brewer sold the stock was approximately $1.01 per share.  *Id.* ¶ 148.  The proceeds to

Brewer from the sale of the 5,000 shares were $5,063.88.  *Id.* ¶ 149.  In addition, in response to

an inquiry from Brewer, Meehan sent Brewer "a list of all of his positions . . . that could be sold,

including Brewer's personal position in Copsync."  *Id.* ¶ 153.  After communicating with his

broker, Brewer changed the order from 5,000 shares to "sell all 95,000 remaining shares."  *Id.*

¶ 154.  Brewer gave his broker the sale order for execution, *id.* ¶ 155, and on January 5, 2017,

Brewer sold 95,000 shares of Copsync, *id.* ¶ 156.  The average price at which Brewer sold the

shares was $1.04 per share.  *Id.* ¶ 157.  The sale of the 95,000 shares yielded $99,114.29.  *Id.*

¶ 158.

The next day, January 6, 2017, prior to the market opening, Copsync issued a press release entitled "Copsync Announces $1.15 Million Registered Direct Offering." *Id.* ¶ 166 (quoting Ex. 63). This press release stated that the combined purchase price for each unit consisting of one share of common stock and two warrants was $0.65. *Id.* ¶ 167. The market price for a share of Copsync common stock at the close of the market on January 5, 2017 was $1.03. *Id.* ¶ 171. But on January 6, 2017, the market price at the close of the market fell to $0.69, *id.* ¶ 172, which represented a decrease of 32.5% from the prior day's closing price. *Id.* ¶ 173. "Had Brewer sold his 100,000 shares of Copsync at the closing stock price after the offering announcement on January 6, 2017, he would have received proceeds of $69,000 instead of $104,178, a difference of $35,178." *Id.* ¶ 175.

Brewer never revealed to the others involved in the trades that he had insider information related to the transactions. *Id.* ¶ 161-63. He "never told his broker that he was in possession of material non-public information concerning Copsync or any company," *id.* ¶ 161, nor did he "discuss the Offering with his broker before the Offering was publicly announced on January 6, 2017," *id.* ¶ 163. Moreover, "Brewer never told Meehan that he might be in possession of material non-public information regarding the Offering[,] and the only time Brewer ever told Meehan that he was in possession of material non-public information was in connection with an unrelated Copsync press release." *Id.* ¶ 162.

## B.    Procedural History

On August 6, 2020, the SEC filed a Complaint against Brewer alleging violations of the Exchange Act and the Advisers Act. ECF No. 1. Brewer answered the Complaint on May 14, 2021. ECF No. 33. Thereafter, the SEC moved for partial summary judgment on Count I of the Complaint, ECF No. 74 (Notice of Mot.), and submitted a Local Civil Rule 56.1 Statement of Material Facts Not in Dispute, ECF No. 74-1 (Pl.'s 56.1). The SEC also filed a Memorandum of

Law in Support of its Motion for Partial Summary Judgment.  ECF No. 79 (Br.).  Following

reassignment to this Court, Brewer opposed the Motion.  ECF No. 81 (Opp.).  The SEC replied

in further support of its Motion (Reply), and in response to an Order from this Court, *see* ECF

No. 85, the SEC filed a supplemental declaration that attached the exhibits cited in the SEC's

Rule 56.1 Statement.  ECF No. 86.

## II.    LEGAL STANDARDS

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "The moving party bears the burden to demonstrate the absence of

any genuine disputes of material fact[.]"  *Silipigno v. United States*, 749 F. App'x 59, 60 (2d Cir.

2019).  Facts are "material" if they "might affect the outcome of the suit under the governing

law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes are "genuine" if "a

reasonable jury could return a verdict for the nonmoving party."  *Id.*; *Aetna Life Ins. Co. v. Big Y*

*Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022) (similar).

"In determining whether there are genuine disputes of material fact, [the Court is]

'required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought.'"  *Union Mut. Fire Ins. Co. v. Ace Caribbean*

*Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023) (quoting *Estate of Gustafson ex rel. Reginella v. Target*

*Corp.*, 819 F.3d 673, 675 (2d Cir. 2016)).  But "a party may not rely on mere speculation or

conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed.*

*Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019).  Instead, the party opposing

summary judgment must establish a genuine issue of fact by "citing to particular parts of

materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  Summary judgment is appropriate

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party." *Michel v. Yale Univ.*, 110 F.4th 551, 560 (2d Cir. 2024) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.    DISCUSSION

### A.    Insider Trading in Violation of Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j.  Rule 10b-5, which implements Section 10(b), prohibits the use of "any device, scheme, or artifice to defraud" or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  "Insider trading—unlawful trading in securities based on material non-public information—is well established as a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5."  *S.E.C. v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012); *In re Nat'l Instruments Corp. Sec. Litig.*, No. 23 Civ. 10488 (DLC), 2024 WL 4108011, at *5 (S.D.N.Y. Sept. 6, 2024) ("Section 10(b) and Rule 10b-5 'are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information.'") (quoting *United States v. Chow*, 993 F.3d 125, 136 (2d Cir. 2021)); *United States v. Cusimano*, 123 F.3d 83, 87 (2d Cir. 1997) (citing *United States v. O'Hagan*, 521 U.S. 642, 650-52 (1997)) (similar).

"There are two theories of insider trading[.]"  *United States v. Rajaratnam*, 719 F.3d 139, 158 (2d Cir. 2013); *see also S.E.C. v. Watson*, 659 F. Supp. 3d 409, 415 (S.D.N.Y. 2023) (describing both theories).  First, "[u]nder the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders."  *Obus*,

693 F.3d at 284. "A second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Id.* "The core difference between the two theories is the source of the duty. Under the classical theory, the duty is owed to the corporation; under the misappropriation theory, the duty is owed to the source of the information." *Watson*, 659 F. Supp. 3d at 415. Here, under the classical theory, the duty was owed to the shareholders, and under the misappropriation theory, the duty was owed to Copsync. *See* Br. at 6. The SEC contends that "Brewer is liable under both theories as a matter of law based on the undisputed facts." Br. at 19.

"Under both theories, the fiduciary duty of trust and confidence requires the person who knows material nonpublic information either to abstain from trading on the information or to make a disclosure before trading." *S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, No. 13 Civ. 4645 (JPO), 2014 WL 5026153, at *5 (S.D.N.Y. Sept. 29, 2014) (citing *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (classical theory); *O'Hagan*, 521 U.S. at 655 (misappropriation theory)); *see also Chow*, 993 F.3d at 137 (explaining the two options). With respect to the classical theory, "[a]n *insider* can avoid liability by disclosing the relevant information publicly so that she is not at a trading advantage over the corporation's shareholders." *One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 2014 WL 5026153, at *5 (emphasis added) (citing *Dirks*, 463 U.S. at 654). As for the misappropriation theory, "[a *misappropriator* can avoid liability by disclosing" to her source "the fact that she will be trading on confidential information . . . ; by doing so, the misappropriator is no longer deceiving her source, and thus she is not violating § 10(b)." *Id.* (emphasis added). Pursuant to the misappropriation theory, to prove liability, a plaintiff must "establish (1) that the defendant

possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 430 (S.D.N.Y. 2015) (quoting *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009)).

Under both theories of liability, scienter is required. *See Obus*, 693 F.3d at 286 ("We read the scienter requirement . . . to apply broadly to civil securities fraud liability, including insider trading (under either the classical or misappropriation theory)[.]"); *see also United States v. Newman*, No. 12 Cr. 121 (RJS), 2013 WL 1943342, at *2 (S.D.N.Y. May 7, 2013) ("*Obus* strongly suggests that . . . the difference between misappropriation and classical insider trading cases is immaterial."). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Obus*, 693 F.3d at 286 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)). "In every insider trading case, at the moment of tipping or trading, just as in securities fraud cases across the board, the unlawful actor must know or be reckless in not knowing that [his] conduct [is] deceptive." *Id*.

### 1.    Brewer Possessed Material, Non-Public Information

A Section 10(b) violator must possess information that is both material and non-public. *See Obus*, 693 F.3d at 284. The information that was known to Brewer satisfies both criteria.

### i.    The Information Brewer Obtained Was Material

"Information is material if 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'" *Rajaratnam*, 802 F. Supp. 2d at 498 (S.D.N.Y. 2011) (alterations in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)); *see also S.E.C. v. Mayhew*, 121 F.3d 44, 51 (2d Cir. 1997); *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 388 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011) (same, granting SEC's motion for summary judgment on Section 10(b) claim). Material information includes "any fact

which in reasonable and objective contemplation might affect the value of the corporation's

stock or securities"; any fact "which [might] affect the probable future of the company and those

which may affect the desire of investors to buy, sell, or hold the company's securities." *Mayhew*,

121 F.3d at 52 (quoting *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en

banc)); *see also Rajaratnam*, 802 F. Supp. 2d at 498 ("It is well settled that in order for

information to be material[] for purposes of § 10(b) and Rule 10b-5, there must be a substantial

likelihood that a reasonable investor would view it as significantly altering the 'total mix' of

information available." (quoting *Cusimano*, 123 F.3d at 88)).

It is undisputed that Brewer possessed material information—specifically, the low yield

that Copsync expected from the Offering—that "would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available." *See Basic

Inc.*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

"On May 27, 2016, . . . Woessner emailed Brewer that . . . the company needed to raise" $3

million "to meet the NASDAQ continuing listing requirement."  Pl.'s 56.1 ¶ 104.  "The

[December 12, 2016] investor presentation stated that the Offering presented was for the sale of

up to 2 million units, which included common stock and warrants."  *Id.* ¶ 123; *see also id.* ¶ 127

(proposed Offering terms summary) (stating "that Copsync was offering up to 2 million shares of

its common stock" and that it would issue "two warrants representing the right to purchase one

additional share of common stock" with each share, and explaining its formula for calculating

the purchase price).  As proposed in the Offering documents, however, "the maximum amount of

money that could be raised in the Offering was $1.8 million before fees and expenses."  *Id.*

¶ 132.  Moreover, Brewer was informed by Chief Compliance Officer and Chief Operating

Officer Meehan on December 22, 2016 that "the amount of proceeds that Copsync was going to

raise in the offering was $1.08 million."  *Id.* ¶ 141.  That amount apparently fell short of the $3

million needed as of June 30, 2016 in order to satisfy NASDAQ's continuing listing requirement. *See id.* ¶ 104. The anticipated $1.08 million also fell short of the $2.5 million needed to satisfy NASDAQ's stockholder's equity requirement. *See id.* ¶ 120. Collectively, this information in the Offering documents possessed by Brewer indicated that Copsync was unlikely to raise the necessary amount from the Offering to maintain its NASDAQ listing. Additionally, "Copsync publicly disclosed in its Form 10-Qs" for the second and third quarters of 2016 that a "delisting of [its] common stock could have an adverse effect on the market price of . . . [its] common stock." Pl.'s 56.1 ¶ 101. A "reasonable investor" would consider the fact that Copsync was likely unable to meet NASDAQ's requirements, and therefore would probably be delisted, as important in the "total mix" of information available. *See Basic Inc.*, 485 U.S. at 231-32.

Brewer also received material information about the discounted price of each unit in the Offering compared to the market rate at the time of the Offering. He forwarded the Offering documents to Womack, the Chief Investment Officer of the Brewer Group, who told him that the Offering would be a "death-spiral deal," which, according to Womack's testimony, meant that he thought "the stock price would go down." Pl.'s 56.1 ¶¶ 134-35. After Copsync announced the Offering on January 6, 2017, its stock price dropped 32.5%. *Id.* ¶ 173. The significant decrease in Copsync's stock price shows that this information "mattered to investors."[6] *See United States v. Mylett*, 97 F.3d 663, 667 (2d Cir. 1996) ("sharp" movement in stock price following announcement "suffice[d] to support a finding that the event in this case was one of major magnitude"); *S.E.C. v. Am. Growth Funding II, LLC*, No. 16 Civ. 828 (KMW), 2018 WL

---

[6] The SEC's expert, Dr. Erin E. Smith—the Assistant Director of the Office of Corporate Finance in the Division of Economic and Risk Analysis of the SEC—conducted an "uncontroverted" event study, Br. at 11, and concluded that the decrease in Copsync's stock price "could only have related to Copsync's disclosures on that date about the offering." Pls' 56.1 ¶ 173; ECF No. 76-6 (Smith Report).

6322145, at *3 (S.D.N.Y. Dec. 4, 2018) ("A decline in stock price soon after the disclosure of a misrepresentation suggests the misrepresentation *mattered* to investors."); c*f. Rajaratnam*, 802 F. Supp. 2d at 516  ("Given the precipitous fall in the stock price and its recovery the following day, the market clearly was hoping to hear that information.").

> ### ii.    The Information Brewer Obtained Was Non-Public

Second, the SEC argues, and Brewer does not dispute, that the information Brewer knew from Copsync was non-public.[7]  "To constitute non-public information under the act, information must be specific and more private than general rumor."  *U.S. Commodity Futures Trading Comm'n v. Byrnes*, No. 13 Civ. 1174 (VSB), 2019 WL 4515209, at *7 (S.D.N.Y. Sept. 19, 2019)); *see also Mylett*, 97 F.3d at 666 (similar).  "Information becomes public when it achieves 'a broad dissemination to the investing public generally and without favoring any special person or group.'"  *Suman*, 684 F. Supp. 2d at 388 (quoting *Lyon*, 605 F. Supp. 2d at 541).

Brewer gained non-public information when he attended a Copsync Board of Directors Meeting in Dallas in August 2016.  *See* Pl.'s 56.1 ¶ 64.  Moreover, Copsync provided Brewer with confidential, non-public information concerning the Offering when, on December 12, 2016, the company's CEO emailed him an investor presentation, a summary of the proposed offering terms, and a contact sheet.  *See* Pl.'s 56.1 ¶ 122.  Brewer does not directly contest that these materials were non-public.  *See* Opp.  Indeed, both the investor presentation and the proposed offering terms were expressly designated "strictly confidential."  *See* Pl.'s 56.1 ¶¶ 124-26; ECF No. 77-5 at 5 (also noting on their face that "[f]ailure to comply with" the confidentiality

---

[7] Brewer does "dispute[] that he ever received material information" or "that there was a manipulative strategic effort to use private information to realize a gain."  Opp. at 4; *see also id.* at 9 (questioning whether Brewer held "private" information).  But he carefully chooses his words in order to sidestep the "non-public" legal standard.

"restriction may constitute a violation of applicable securities laws").  Thus, Brewer has not raised a genuine issue of material fact as to whether he possessed material, non-public information from Copsync.

## 2.    Brewer Owed a Duty of Confidentiality Under Both the Classical and the Misappropriation Theories of Insider Trading

An insider's duty of confidentiality "exists when 'there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties.'"  *Suman*, 684 F. Supp. 2d at 389 (quoting *United States v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001)).  "To establish acceptance" of the duty of confidentiality, "the plaintiff must show [that] defendant was on notice of his duty not to use or disclose the material non-public information."  *Id.* at 389.  "This element is satisfied . . . when, without disclosure to his principal, [the fiduciary] uses the information to purchase or sell securities."  *O'Hagan*, 521 U.S. at 656.  It is undisputed that Brewer had a duty of confidentiality under both theories of insider trading—first, under the "classical theory," because he was a "temporary insider," *United States v. Kosinski*, 976 F.3d 135, 143 (2d Cir. 2020), and, second, under the "misappropriation theory," in light of the confidentiality provisions in the agreements he signed, because he made "undisclosed, self-serving use of a principal's information to purchase or sell securities."  *Id.* at 144.

### i.    Brewer Owed a Duty of Confidentiality to Copsync as a Temporary Insider of the Company

The Supreme Court has explained that "[t]he classical theory applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation."  *Chow*, 993 F.3d at 137 (quoting *Dirks*, 463 U.S. at 655 n.14); *see also United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991) (en banc) (noting that "an outsider could obtain temporary insider status by

gaining access to confidential information through certain relationships with a corporation—as, for example, an underwriter, lawyer or consultant."). Courts in this District have referred to such fiduciaries as "temporary insiders." *Kosinski*, 976 F.3d at 144.

A connection between parties that falls short of a fiduciary relationship nevertheless can support an insider trading claim as long as it "share[s] the essential characteristics of a fiduciary association" such that it is "the functional equivalent of a fiduciary relationship." *Chestman*, 947 F.2d at 568. "Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information." *Falcone*, 257 F.3d at 234-35; *see also Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 169 (2d Cir. 1999) (insider trading doctrine "clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship'" (quoting *Chestman*, 947 F.2d at 565)); *Veleron Holding, B.V.*, 117 F. Supp. 3d at 430 (same).

It is undisputed that, by serving as a consultant, Brewer was "clothe[d]" in such a "temporary insider status." *Cf. Simon DeBartolo Grp., L.P.*, 186 F.3d at 169 (quoting *Chestman*, 947 F.2d at 565)). Brewer "oversaw" Brewer & Associates as its CEO and the Brewer Group as its portfolio manager. Pl.'s 56.1 ¶¶ 14, 55. Brewer & Associates contractually agreed to serve as a consultant to Copsync by "provid[ing] high-level, overall global business development strategy and support" to the company. *Id.* ¶ 50 (quoting Ex. 15). Those contracts bound Brewer & Associates and, by extension, Brewer personally, to act as a business adviser and a "'public facing figure' for Copsync." *Id.* ¶¶ 50-51, 60. Brewer was contractually obligated to "'[p]articipate in Company conference calls and meetings as requested'" by Copsync. *Id.* ¶ 51 (quoting Ex. 15). In short, the nature of Brewer's relationship with Copsync rendered him a

temporary insider.  *See Suman*, 684 F. Supp. 2d at 389 (finding duty of confidentiality where

contractor defendant exposed to confidential information signed a "Personal Pledge and

covenanted not to use information about planned business acquisitions to trade in securities in

companies 'seeking to do business with'" a company); *Chow*, 993 F.3d at 138 (an "individual[]

who enter[ed] into . . . confidentiality agreements, pursuant to which [he] [was] given access to

company information that [he] agree[d] not to disclose [accorded him] 'temporary insider[]'"

status).

As a temporary insider, Brewer attended at least one board meeting where he was

exposed to confidential corporate information, Pl.'s 56.1 ¶ 64; was invited to a "Trusted

Advisors Meeting," *id.* ¶ 65; and received confidential information about the Offering by email,

*id.* ¶ 122.  Moreover, as set forth below, Brewer entered into agreements that contained

confidentiality provisions.  *See* Pl.'s 56.1 ¶¶ 55, 59, 61, 142.  In sum, Brewer was provided with

"legitimate access to corporate secrets and thus owed a fiduciary duty to shareholders."  *S.E.C. v.*

*Softpoint*, 958 F. Supp. 846, 863-64 (S.D.N.Y. 1997) (granting summary judgment on insider

trading claim against consultant who was a "corporate insider"), *aff'd*, 159 F.3d 1348 (2d Cir.

1998).

As further confirmation of his temporary insider status, Brewer "was entrusted with

[Copsync's] information solely because" of his contractual relationship, and he "would not have

been provided this information absent his 'explicit acceptance of a duty of confidentiality.'" *See*

*Kosinski*, 976 F.3d at 145 (deeming drug trial investigator temporary insider).  This means that

Brewer "play[ed] [a] fiduciary-like role[]" at Copsync.  *Id.* at 145; *see also Falcone*, 257 F.3d at

229 ("[A] relationship of trust and confidence [exists] between the shareholders of a corporation

and those insiders who have obtained confidential information by reason of their position with

that corporation[.]").  Brewer owed a duty of confidentiality to Copsync as a result of his

temporary insider status.

> ii.    **Under a Misappropriation Theory, Brewer Assumed a Duty of Confidentiality with Respect to Copsync**

Even if Brewer were not a temporary insider, it is undisputed, as explained above, that he

*assumed* a contractual duty of confidentiality.  Exchange Act Rule 10b5-2 provides that a "duty

of trust or confidence" exists for purposes of the misappropriation theory of insider trading

"[w]henever a person agrees to maintain information in confidence."  17 CFR § 240.10b5-2; *see*

*United States v. Corbin*, 729 F. Supp. 2d 607, 615 (S.D.N.Y. 2010) ("express confidentiality

agreement" creates "duty of trust or confidence").

Here, there is no genuine dispute of material fact that Brewer entered into "express

confidentiality agreement[s]" with Copsync that "g[a]ve[] rise to a duty" of "trust or

confidence."  *See Corbin*, 729 F. Supp. 2d at 615; *see also United States v. Kosinski*, No. 3:16

Cr. 00148 (VLB), 2017 WL 3527694, at *5 (D. Conn. Aug. 16, 2017) (holding that "a

confidentiality agreement creates a duty of trust and confidence").  Brewer signed the Advisory

Agreement and the Expansion Agreement on behalf of Brewer & Associates, Pl.'s 56.1 ¶¶ 55,

59, and he signed the Endorsement Agreement in his personal capacity, *id.* ¶ 61.  In addition,

Brewer instructed Meehan to "[s]ign and send" the Securities Purchase Agreement on Brewer's

behalf.  *Id.* ¶ 142.  The Advisory Agreement stated "that Brewer & Associates 'w[ould] maintain

in confidence all proprietary, non-published information obtained by [Brewer & Associates] with

respect to the Company during the course of the performance of [Brewer & Associates] services

hereunder, and [Brewer & Associates] sh[ould] not use any of the same for its own benefit.'"  *Id.*

¶ 52 (quoting Ex. 15).  The Expansion Agreement, which "ratified and confirmed" "all of the

terms and provisions in the Advisory Agreement," incorporated the confidentiality provisions of

the Advisory Agreement.  *Id.* ¶¶ 57, 59.  The Securities Purchase Agreement in turn provided

that Brewer & Associates "covenant[ed] that . . . [it] [would] maintain the confidentiality of the

existence and terms of this transaction," *id.* ¶ 139 (quoting Ex. 54), and that neither it "nor any

Affiliate acting on its behalf" would "execute any purchases or sales" prior to announcement of

the transaction, *id.* ¶ 140 (quoting Ex. 54).  Each of these "express confidentiality

agreement[s]"—in the Advisory Agreement, the Expansion Agreement, the Endorsement

Agreement, and the Securities Purchase Agreement—created a duty of trust or confidence to

Copsync in Brewer.  *See* 17 CFR § 240.10b5-2; *Chow*, 993 F.3d at 138 (affirming conviction on

misappropriation theory in which defendant had a "duty of trust or confidence" based on non-

disclosure agreement even though "the company and the individual ha[d] an arm's-length

relationship").

### 3.    Brewer Breached his Duty of Confidentiality

Brewer received material non-public information from Copsync.  "To demonstrate that

[Brewer] misappropriated this information, the SEC must show that the information was

acquired through a breach of a relationship of trust and confidence."  *See S.E.C. v. Falbo*, 14 F.

Supp. 2d 508, 522 (S.D.N.Y. 1998); *see also United States v. Walters*, 910 F.3d 11, 30 (2d Cir.

2018) ("[A] person violates [the securities laws] when he misappropriates material nonpublic

information in breach of a fiduciary duty or similar relationship of trust and confidence and uses

that information in a securities transaction." (quoting *United States v. Falcone*, 257 F.3d 226,

230 (2d Cir. 2001)).  "[F]or purposes of both civil and criminal enforcement actions under §

10(b) . . . and Rule 10b-5[,]" the act of "'misappropriat[ing] confidential information for

securities trading purposes, in breach of a duty owed to the source of the information,'" results in

liability for the misappropriator.  *United States v. Gansman*, 657 F.3d 85, 90-91 (2d Cir. 2011)

(quoting *O'Hagan*, 521 U.S. at 652).

Here, as previously explained, there is no genuine dispute of material fact that Brewer had a duty of confidentiality with respect to information that he had obtained from Copsync. "[Copsync] placed [Brewer] in a position of trust and confidence[,] and he used for personal benefit information obtained during the course of this association." *Falbo*, 14 F. Supp. 2d at 523 (granting SEC summary judgment on insider trading claim against contractor who "was entrusted with . . . access to all of the offices in [a company's] building" and obtained and "used . . . confidential information which rightfully belonged exclusively to [the company's] shareholders for his own gain"). Nor is there a genuine dispute of material fact that Brewer obtained a benefit. On January 4 and 5, 2017, Brewer traded 100,000 shares of Copsync stock while in possession of confidential information. *See* Pl.'s 56.1 ¶¶ 145-160. Specifically, on January 4, 2017, Brewer directed Meehan to facilitate the trade of 5,000 of his Copsync shares. *Id.* ¶ 145. That day, "Meehan texted Brewer's broker and, pursuant to Brewer's instructions, placed an order to sell 5,000 shares," *id.* ¶ 146, which were sold at "approximately $1.01 per share," yielding $5,063.88. *Id.* ¶¶ 148-49. Shortly thereafter, "Brewer gave his broker the sale order for execution" to "sell all 95,000 remaining shares of Copsync," *id.* ¶¶ 154-55, which were sold on January 5, 2017, *id.* ¶ 156. "The average price at which Brewer sold the shares was $1.04 per share," totaling $99,114.29. *Id.* ¶¶ 157-58. Brewer breached his duty of confidentiality by making these trades while in possession of the Offering information. *See Falbo*, 14 F. Supp. 2d at 523; *S.E.C. v. Svoboda*, 409 F. Supp. 2d 331, 340-41 (S.D.N.Y. 2006) ("The undisputed facts set forth by the SEC demonstrate that Svoboda breached fiduciary duties owed to NationsBank and its clients by passing along confidential information . . . and by personally trading on such information despite his knowledge that doing so violated NationsBank's insider trading policies[.]"); *cf. Suman*, 684 F. Supp. 2d at 389 ("Because he was

in knowing possession of information regarding the deal, Suman breached his fiduciary duty the

moment he began acquiring options and purchasing shares in Molecular Devices.").

> 4. **There is No Genuine Dispute of Material Fact that Brewer Acted with Scienter when He Traded While in Possession of Material, Non-Public Information**

In order to prevail on an insider trading claim, "the SEC must establish that [a defendant]

traded while in knowing possession of material non-public information." *Obus*, 693 F.3d at 293.

Although "[i]ssues of motive and intent are usually inappropriate for disposition on summary

judgment," *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984), "district courts should

not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to

meet the requirements prescribed by Rule 56[]." *S.E.C. v. Rsch. Automation Corp.*, 585 F.2d 31,

33-34 (2d Cir. 1978). In the Second Circuit, "recklessness is sufficient" to establish scienter.

*One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 2014 WL 5026153, at *6; *Breard*

*v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir. 1991) ("scienter includes recklessness"

for purposes of Rule 10b-5 insider trading claims); *S.E.C. v. Solucorp Inds., Ltd.*, 274 F. Supp.

2d 379, 419 (S.D.N.Y. 2003) (scienter under Section 10(b) "may be satisfied by proof of reckless

conduct").

Here, there is no genuine dispute that Brewer acted with scienter in trading while

knowingly possessing material information that was obtained in violation of a duty of trust and

confidence. As previously explained, in his personal capacity and on behalf of Brewer &

Associates, Brewer signed several agreements with Copsync that contained confidentiality

provisions. *See* Pl.'s 56.1 ¶¶ 52-53 (Advisory Agreement), 56-59 (Expansion Agreement), 61

(Endorsement Agreement); 142-43 (Securities Purchase Agreement). Those agreements

expressly notified Brewer of his own, and his portfolio companies', specific obligations with

respect to the confidential, inside information he would subsequently gain. *See id.* Accordingly,

Brewer was aware when he traded his Copsync stock that he was subject to a duty of confidentiality. *See Falbo*, 14 F. Supp. 2d at 524 ("In disclosing material information to Falbo, Billings explicitly warned him that he could not trade on the information because of her status at [the company].").

At the very least, as a sophisticated, licensed financial services professional, Brewer acted recklessly. *See* Pl.'s 56.1 ¶¶ 3-11, 13, 18, 20-21 (describing Brewer's educational and professional background); *cf. S.E.C. v. Sanchez*, No. 21 Civ. 8085 (PKC), 2022 WL 1036792, at *2 (S.D.N.Y. Apr. 6, 2022) (holding SEC enforcement action "adequately allege[d] . . . scienter because [defendant] knew, due to his role as a compliance analyst, that the information obtained from the investment bank's confidential database was material and nonpublic"); *Kosinski*, 976 F.3d at 155 (finding significant that the defendant was a "sophisticated investor"); *S.E.C. v. Alexander*, No. 00 Civ. 7290 (LTS) (HBP), 2004 WL 1468528, at *10 (S.D.N.Y. June 28, 2004) (noting a "record show[ed] a high degree of scienter" where defendant was "a sophisticated businessman"). More specifically, Brewer testified that he was aware of what constituted material information. ECF No. 74-13 at 235 (explaining that his "understanding of material [was] any event that require[d] a public filing or press release to be sent"); Pl.'s 56.1 St. ¶¶ 43-44. Similarly, Brewer stated that he understood that "nonpublic information include[d] materials discussed at a board meeting." ECF No. 74-13 at 236.

In addition, in his capacity as CEO, Brewer was provided with compliance training by Brewer Capital in the form of the WSPs. *See* Pl.'s 56.1 ¶¶ 26-27, 39. The WSPs specifically described how to discern if he was in possession of material, non-public information and explained that "all persons associated with [Brewer Capital] are prohibited from engaging in any securities transaction . . . while in possession of" such information. *See id.* ¶ 33. The WSPs also stated that Brewer could become a temporary insider as a result of a "special confidential

relationship," *id.* ¶ 34, evidencing that Brewer was aware of circumstances that would render him a temporary insider.  *See S.E.C. v. Materia*, No. 82 Civ. 6225, 1983 WL 1396, at *2 (S.D.N.Y. Dec. 5, 1983), *aff'd*, 745 F.2d 197 (2d Cir. 1984) (finding defendant "acted with scienter" where confidentiality "policy was prominently posted").

The record is replete with undisputed facts showing that Brewer acted with the necessary scienter to establish violations of Section 10(b) and Rule 10b-5.  As the SEC argues, and Brewer does not contest, "[t]he Offering was a private placement of securities that also required the issuance of a press release, as described in the Securities Purchase Agreement."  Br. at 25. Brewer knew he possessed the non-public documents relating to the Offering from Copsync because he "forwarded the email from Copsync's CEO containing the investor presentation, summary of proposed offering terms, and the contact sheet to Womack" and wrote to Womack: "Let's discuss again if you can."  Pl.'s 56.1 ¶ 133.  Additionally, the information in Brewer's possession indicated that the Offering was unlikely to raise sufficient capital to prevent Copsync from being "subject to suspension and subsequent delisting" from NASDAQ.  *Id.* ¶¶ 120; *see also, e.g.*, *id.* ¶¶ 132-44.  Brewer knew that a delisting was "never good," and that Copsync's inability to raise the required capital from the Offering was likely to "have a negative impact on [Copsync's] stock price."  *Id.* ¶ 103.

Brewer's only argument to the contrary is that Morgan Stanley and Copsync engaged in the Rule "144 process"—"a gatekeeping function to ensure that the sell [sic] of securities is proper under the rules"—which permitted him to trade the shares.  *Id.*  This does not raise a genuine issue of material fact with respect to scienter.  As the SEC points out, the Rule "144 process", *id.*, had nothing to do with clearing Brewer to sell shares while possessing confidential, insider information.  Reply at 9-12 ("[T]he Rule 144 process is irrelevant" because "Morgan Stanley did not conduct a review to determine whether Brewer had non-public information").

Instead, the Rule 144 process is intended to ensure that a securities sale complies with a different, unrelated provision of the securities laws.  Reply at 9.  In any event, as Brewer should have known, he obtained the confidential inside information *after* completing the Rule 144 process.  Reply at 8 ("Morgan Stanley's Rule 144 process was completed before Brewer received material, nonpublic information from Copsync.").  Specifically, "Morgan Stanley's Rule 144 process had been completed" by November 30, 2016, Reply at 11 (citing Pl.'s 56.1 ¶ 87), and it is undisputed that Brewer did not receive the information at issue until either December 9, 2016 when, at a board meeting, Copsync's Board of Directors authorized conducting a securities offering, or at a later time.  *See id.* (citing Pl.'s 56.1 ¶¶ 121-122) (noting the possibility that Brewer received the information on December 12, 2016).  Thus, even if Brewer believed that the Rule 144 process cleansed any transactions that took place through November 30, 2016,[8] he could not have believed that it would do so prospectively.

In brief, it is undisputed that Brewer possessed material, non-public information directly from Copsync; that he acquired a duty of trust and confidence to Copsync a result of his temporary insider status and the confidentiality provisions in the agreements he signed; that he breached that duty by trading his shares for personal gain without disclosing that he possessed material, non-public information; and that he possessed the requisite scienter to violate Section 10(b) and Rule 10b-5.  Accordingly, based on the undisputed facts, the SEC is entitled to judgment as a matter of law that Brewer violated Section 10(b) and SEC Rule 10b-5.  Fed. R. Civ. P. 56(a).

---

[8] Notably, in Brewer's submission to comply with the Rule 144 process, he never made any statement that he was in possession of material, non-public information.  *See* Pl.'s 56.1 ¶¶ 75-81.

## IV.     CONCLUSION

For the foregoing reasons, this Court GRANTED the SEC's motion for partial summary judgment on its claim pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.

By **June 9, 2025**, the parties shall file a joint letter proposing next steps.

SO ORDERED.

Dated:  May 30, 2025
        New York, New York

                                        _____
                                        JENNIFER H. REARDEN
                                        United States District Judge